COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| SOLCIUS, LLC and GOODLEAP, LLC (formerly known as LOANPAL), | § § § | No. 08-22-00146-CV |
| Appellants, | § | Appeal from the |
| v. | § | 168th Judicial District Court |
| SALVADOR MERAZ, | § | of El Paso County, Texas |
| Appellee. | § § | (TC# 2021DCV3036) |

## MEMORANDUM OPINION

This is an appeal from an order denying Appellants' motion to compel arbitration. Because the record contains conclusive evidence that Appellee electronically signed contracts with Appellants that contained arbitration provisions, we reverse the trial court's order and remand to the trial court with directions to enter an order granting the motion to compel arbitration and staying Appellee's lawsuit pending arbitration.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee Salvador Meraz (Meraz) acknowledges that he entered into an oral agreement with Appellant Solcius, LLC (Solcius) to install solar panels on two of his properties and that he further applied for and received financing for the installation with Appellant Goodleap, LLC (Goodleap), formerly known as LoanPal. Meraz further acknowledges that Solcius installed the

panels on his residence but claims that they were not performing as Solcius had represented they would. Meraz also claims Solcius never completed the installation on his second property and that his roof was damaged during the installation.

The record reflects that the installation occurred in the summer of 2019[1] Approximately two years later, in August of 2021, Meraz filed his lawsuit, naming both Solcius and Goodleap as defendants (collectively, the Solar Defendants). Meraz sued for breach of contract and fraud in the inducement, alleging that Solcius had intentionally misrepresented the amount of energy savings he would receive from the solar panels.

The Solar Defendants responded by filing a joint answer denying the allegations then filing a joint "Motion to Dismiss and Compel Arbitration" contending Meraz had electronically signed contracts that contained arbitration provisions indicating Meraz's agreement to arbitrate any dispute arising out of the subject matter of the contracts. Meraz then amended his petition to add a claim for "unauthorized entering into contract," contending that he did not sign either contract. He also responded to the motion to compel arbitration claiming he did not sign the contracts and therefore never agreed to the arbitration provisions. In support of his response, Meraz attached his own affidavit acknowledging that he had entered into an oral agreement with Solcius to install the solar panels but claiming that the installation was completed before he received any written contract to sign, despite his requests to review the proposed terms of the contract. Meraz, however, acknowledged receipt of his allegedly signed electronic contract copies on an unspecified date after the installation occurred but again claimed he never signed them, implying that the Solar Defendants signed them on his behalf.

---

[1] The record contains several statements indicating that the installation occurred in 2020, rather than 2019. However, Solcius clarified in an unrebutted affidavit that the installation was completed in August of 2019, and Goodleap also presented unrebutted evidence that its loan agreement with Meraz arose in March of 2019.

In reply, the Solar Defendants alleged that they had evidence conclusively establishing that Meraz had electronically signed the contracts. Solcius submitted a sworn declaration from its employee, Michael Molen, explaining the procedures, which we review in more detail below, that Solcius uses to obtain electronic signatures on installation agreements. Molen explained that Solcius uses a company called DocuSign to obtain signatures, and he averred that Meraz had in fact signed an electronic agreement to install the solar panels on his properties (the Installation Agreement) prior to the installation using the DocuSign system. Molen attached a copy of the Installation Agreement in Spanish, which he contended Meraz had electronically signed, and also attached a version in English.[2] The Installation Agreement contained a provision in bold lettering stating that Meraz was agreeing to arbitrate any dispute arising out of the subject matter of the agreement, with Meraz's initials below it. Molen further attested that the attached Installation Agreement was a true and correct copy of the contract that Meraz had electronically signed and initialled.

Similarly, Goodleap provided a sworn declaration from its chief financial officer, Matt Dawson, who explained the procedures, which we will review in more detail below, that Goodleap uses to obtain electronic signatures on loan agreements. Dawson explained that after a customer has applied for and received approval for a loan, Goodleap sends a loan agreement to the customer to sign electronically, also using DocuSign. Dawson stated that Meraz had applied for and received financing with Goodleap for the solar installation and had thereafter electronically signed a loan agreement, setting forth the financing terms (the Loan Agreement). Dawson attached a copy of the Loan Agreement in Spanish, which he contended Meraz had electronically signed, and also

---

[2] The translation was by an attorney/member of the American Translators Association, who provided a certificate attesting that he was competent to translate the agreement.

attached a version in English.[3] The Loan Agreement contained a provision in bold lettering stating that Meraz was agreeing to arbitrate any dispute arising out of the subject matter of the agreement, with Meraz's initials below it. Dawson further averred that the attached Loan Agreement was a true and correct copy of the agreement that Meraz had electronically signed. Dawson also supplied a certificate of completion from DocuSign, which we discuss below.

The trial court denied the Solar Defendants' motion to dismiss and to compel arbitration without explanation. The Solar Defendants filed a joint motion to reconsider, and Solcius attached what it described as newly discovered evidence consisting of a certificate of completion from DocuSign relating to Meraz signing the Installation Agreement. Meraz opposed the motion, contending that neither defendant had presented sufficient evidence to support a finding that he had signed the contracts. The motion for reconsideration was overruled by operation of law, and the Solar Defendants filed this interlocutory appeal.

## II. ISSUES ON APPEAL

In their joint brief, the Solar Defendants contend that the trial court erred in denying their motion to compel arbitration, arguing that they conclusively established that Meraz electronically signed contracts with them containing valid and enforceable arbitration agreements, and that all of Meraz's claims fell within the scope of those agreements. In response, Meraz contends that the trial court had sufficient evidence to deny the motion based on his affidavit in which he averred that he did not sign the parties' electronic contracts. Meraz also raises two procedural issues that he contends support the order denying the motion to compel arbitration: (1) the motion itself was not timely filed, and (2) the records the defendants attached to their motion were not properly authenticated and therefore could not be considered in determining whether he agreed to

---

[3] The translated Loan Agreement was certified by the same translator Solcius had used.

4

arbitration. Finally, Meraz argues that we should not consider the evidence the Solar Defendants attached to their motion for reconsideration because nothing in the Rules of Civil Procedure provide for filing a motion for reconsideration; instead, he contends that the Solar Defendants should have filed a motion for new trial.[4]

### III. MERAZ'S PROCEDURAL CHALLENGES ARE WITHOUT MERIT

**A. The motion to compel arbitration was not untimely**

We first consider whether the motion to dismiss and to compel arbitration was timely filed. In the trial court, as well as on appeal, Meraz seeks to characterize the motion as being a Rule 91a motion to dismiss, which must be filed within 60 days after service of the plaintiff's first filing. *See* TEX. R. CIV. P. 91a.3(a). Rule 91a, however, by its express terms only governs motions "to dismiss a cause of action on the grounds that it has no basis in law or fact." TEX. R. CIV. P. 91a.1. And, as the Solar Defendants point out, their motion primarily sought to compel arbitration based on the parties' contracts and secondarily sought to dismiss Meraz's lawsuit on the basis that arbitration was the proper forum in which to resolve his claims, as opposed to dismiss the suit on Rule 91a grounds.[5]

---

[4] This argument is without merit. While a motion to reconsider is not expressly provided for in the Rules, a trial court retains plenary jurisdiction to reconsider its interlocutory rulings until a final judgment or order is entered and the decree becomes final. *Fernandez v. State*, 621 S.W.3d 818, 826 (Tex. App.—El Paso 2021, pet. ref'd) (citing *Fruehauf Corp. v. Carrillo*, 848 S.W.2d 83, 84 (Tex. 1993) (per curiam) (a trial court has plenary power over its judgment until it becomes final); *White v. Baptist St. Anthony's Hosp.*, 188 S.W.3d 373, 374–75 (Tex. App.—Amarillo 2006, pet. denied) (recognizing that a trial court has plenary jurisdiction to reconsider its interlocutory rulings and retains that ability until a final judgment or order is entered in the cause and a decree becomes final); *see also In re Panchakarla*, 602 S.W.3d 536, 539–40 (Tex. 2020) (per curiam) (recognizing that a trial court retains continuing control over interlocutory orders and may set them aside any time before a final judgment is rendered). Moreover, a motion for new trial is only applicable when the trial court has issued a final judgment, which it did not do here. *See, e.g.*, *Finley v. J.C. Pace Ltd.*, 4 S.W.3d 319, 320 (Tex. App.—Houston [1st Dist.] 1999, no pet.) ("A motion for new trial must, by its very nature, seek to set aside an existing judgment and request relitigation of the issues."); *see also* TEX. R. CIV. P. 320 ("New trials may be granted and judgment set aside for good cause . . .")

[5] In the trial court, the Solar Defendants argued that the trial court should dismiss Meraz's lawsuit upon granting their motion to compel arbitration, rather than simply staying the proceedings, as all of Meraz's claims were subject to binding arbitration. However, as discussed in more detail below, we conclude that the proper procedure to follow when granting a motion to compel arbitration is to stay the proceedings. That the Solar Defendants requested dismissal

There is no provision in the Rules of Civil Procedure requiring a party to file a motion to compel arbitration within a specific timeframe. Instead, a party is only barred from filing a motion to compel arbitration if it has "substantially invok[ed] the judicial process to the other party's detriment" before seeking to invoke an arbitration clause, given the inherent unfairness of allowing a party to switch between "litigation and arbitration." *See In re Citigroup Global Mkts., Inc.,* 258 S.W.3d 623, 625 (Tex. 2008) (orig. proceeding) (per curiam) (recognizing that a party waives an arbitration clause by substantially invoking the judicial process to the other party's detriment) (quoting *Perry Homes v. Cull*, 258 S.W.3d 580, 589–90 (Tex. 2008)). Here, Meraz does not claim that the Solar Defendants invoked the judicial process to his detriment prior to filing their motion to compel arbitration, and the record does not reflect that they did so or that they switched between litigation and arbitration before filing their motion. Accordingly, we reject Meraz's argument that the motion to compel arbitration was not timely filed. *See Lucchese, Inc. v. Solano*, 388 S.W.3d 343, 351–52 (Tex. App.—El Paso 2012, no pet.) (defendant was not barred from filing its motion to compel arbitration where there was no showing that it substantially invoked the judicial process or that it switched between litigation and arbitration to its own advantage).

## B. Meraz waived his authentication challenges

We next consider Meraz's argument that the records submitted in support of the motion to compel arbitration were not properly authenticated and were therefore inadmissible. In particular, Meraz contends that the Solar Defendants failed to accompany their records with either a business records affidavit to establish their authenticity, as provided for in Rule 902(10) of the Texas Rules

---

rather than a stay does not change their intent to compel arbitration rather than seek a dismissal on the merits. *See In re H&R Block Fin. Advisors, Inc.*, 262 S.W.3d 896, 902–03 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (finding that trial court abused its discretion in failing to order arbitration despite that the defendant requested dismissal of the plaintiff's lawsuit rather than a stay of the proceedings pending arbitration).

of Evidence, or a notarized certificate of acknowledgement, as provided for in Rule 902(8).[6] And in turn, Meraz contends that the sworn but unnotarized declarations that the Solar Defendants provided—in which their employees attested to the true and correct nature of the records—were insufficient to authenticate the records.

As the Solar Defendants point out, Meraz did not raise any authentication challenges to the records, or any other challenge to the admissibility of the records for that matter, in the trial court. Challenges to the admissibility of evidence based on a failure to authenticate is considered a formal defect that is waived unless a party makes a timely objection to the evidence on that basis in the trial court and obtains a ruling on the objection. *See Howe v. Howe*, 551 S.W.3d 236, 252 (Tex. App.—El Paso 2018, no pet.) (citing *Seymour v. Gillespie*, 608 S.W.2d 897, 898 (Tex. 1980) (authentication is one of the evidence-predicate objections that must be specifically raised); *Morales v. Rice*, 388 S.W.3d 376, 381 (Tex. App.—El Paso 2012, no pet.) (appellant waived authentication error where it was not raised in the trial court; *see generally* TEX. R. APP. P. 33.1 (prerequisite to presenting a complaint for appellate review, complaint must be made to the trial court by a timely request, objection, or motion, and ruled on either expressly or implicitly (or ruling refused)). Because Meraz failed to make an authentication objection in the trial court, he has failed to preserve this issue for our review.[7] *See Howe*, 551 S.W.3d at 252 (where party made no objection at trial based on authentication, his authentication argument was waived on appeal).

---

[6] Rule 908(10) provides that a document is self-authenticating if it is accompanied by an affidavit from an individual with knowledge of how the records are kept and who can attest that the records were kept in the regular course of business. TEX. R. EVID. 902(10). Rule 902(8) provides that a document is self-authenticating if it is accompanied by a "certificate of acknowledgment that is lawfully executed by a notary public or another officer who is authorized to take acknowledgments." TEX. R. EVID. 902(8).

[7] The Solar Defendants also contend that even if we were to overlook Meraz's failure to preserve this issue for our review, we should find that their employees' sworn declarations attesting to the accuracy of the records they attached were sufficient to authenticate the records. We need not reach this issue.

## IV. THE TRIAL COURT ERRED IN DENYING ARBITRATION

Having rejected Meraz's procedural challenges, we turn to the merits of the Solar Defendants' argument that the trial court erred in denying their motion to compel arbitration.

### A. Standard of review

Arbitration is a contractual proceeding by which the parties, in order to obtain a speedy and inexpensive final disposition of disputed matters, consent to submit the controversy to arbitrators for resolution. *See In re Phelps Dodge Magnet Wire Co.*, 225 S.W.3d 599, 605 (Tex. App.—El Paso 2005, orig. proceeding [mand. denied]) (citing *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992)). The party seeking to compel arbitration must prove that a valid and enforceable arbitration agreement exists, which includes proving that the other party consented to the agreement. *See Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 204 (Tex. 2021). The question of whether an arbitration agreement is valid and enforceable is a question of law subject to de novo review. *See Baby Dolls Topless Saloons, Inc. v. Sotero*, 642 S.W.3d 583, 586 (Tex. 2022) (per curiam) ("If one party resists arbitration, the trial court must determine whether a valid agreement to arbitrate exists, which is a question of law subject to de novo review.").

While a party seeking to avoid arbitration can challenge the validity of the contract as a whole or the validity of the arbitration provision specifically, it may also challenge whether an agreement exists at all. *Id.* at 586 (citing *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 124 (Tex. 2018). And here, Meraz contends that no agreement to arbitrate exists, as he never signed the electronic contracts with either of the Solar Defendants and therefore never agreed to arbitrate any disputes.

### B. Applicable Law: The Texas Uniform Electronic Transactions Act

In large part, the answer to whether Meraz consented to the arbitration agreements depends on whether his electronic signature on the contracts can be considered genuine. As the Texas

Supreme Court has recognized, when a party signs a paper document, direct evidence can prove the genuineness of his signature, such as through a witness with the expertise to compare the signature against a genuine specimen. *Aerotek, Inc.*, 624 S.W.3d at 204. However, an electronic signature requires "nothing more than clicking a box online and recording the information in an electronic database," and therefore traditional methods of establishing whether a party's signature is genuine are of no utility. *Id*. at 205. To address issues relating to the increasing use of electronic contracts, the Texas Legislature enacted the Texas Uniform Electronic Transactions Act (the Act). *Id.* at 200, 205 (citing TEX. BUS. & COM. CODE ANN. ch. 322). In determining whether an electronic signature can be attributed to an individual, the Act's focus is on the efficacy of the security procedures inherent in the electronic transaction itself. TEX. BUS. & COM. CODE ANN. § 322.009(a) (providing that "[a]n electronic record or electronic signature is attributable to a person [by] showing . . . the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable"). Thus, once the parties have agreed to conduct business by electronic means, the party seeking to hold another responsible for signing an electronic contract must come forward with evidence to establish the efficacy of the security procedures utilized in the transaction. *Aerotek, Inc.*, 624 S.W.3d at 204. The Act defines a security procedure as any

> procedure employed for the purpose of verifying that an electronic signature, record, or performance is that of a specific person or for detecting changes or errors in the information in an electronic record [which includes] a procedure that requires the use of algorithms or other codes, identifying words or numbers, encryption, or callback or other acknowledgment procedures.

TEX. BUS. & COM. CODE ANN. § 322.002(13). And it is the efficacy of the security procedures used in an electronic transaction that "provides the link between the electronic record stored on a computer or in a database and the person to whom the record is attributed." *Aerotek, Inc.*, 624 S.W.3d at 205–06.

9

The party opposing the enforcement of an electronic agreement may come forward with evidence that the security procedures utilized in the transaction "lack[ed] integrity or effectiveness," and that therefore, the party's signature on the contract cannot reliably be attributed to him. *Id.* at 210; *see also Knox Waste Serv., LLC v. Sherman*, No. 11-19-00407-CV, 2021 WL 4470876, at \*9 (recognizing same). However, a party seeking to avoid the agreement cannot do so by submitting an affidavit merely denying that he signed the agreement, as such affidavits are nothing more than mere arguments to avoid an agreement and are insufficient to cast doubt on an otherwise reliable agreement. *Aerotek*, 624 S.W.3d at 206–209 (when faced with evidence conclusively demonstrating the reliability of the authentication procedures for electronic signatures, "[m]ere denials do not suffice" to create a genuine issue of material fact regarding the genuine nature of the signature); *see also Knox Waste Serv., LLC*, 2021 WL 4470876, at \*9 (recognizing same); *CHG Hosp. Bellaire, LLC v. Johnson*, 644 S.W.3d 188, 189 (Tex. 2022) (holding that a party to an electronic agreement did not create a fact issue regarding whether she consented to arbitrate a dispute simply by submitting an affidavit stating that she did not recall "electronically acknowledging the arbitration agreement at issue").

Although an appellate court must typically defer to a trial court's express or implied finding that a party did not sign an agreement, the finding must be supported by evidence. *Aerotek*, 624 S.W.3d at 204. When a party has presented evidence conclusively establishing the efficacy of the security procedures utilized to obtain the other parties' signature on an electronic contract and the opposing party has failed to come forward with any evidence of fraud or lack of reliability with respect to those procedures, a court has no choice but to enforce the contract. *See id.* at 200, 205-07, 209-10 (citing TEX. BUS. & COM. CODE ANN. §§ 322.001–.009); *see also Knox Waste Serv.*, 2021 WL 4470876, at \*7, \*9 (enforcing an arbitration agreement where appellants provided metadata conclusively demonstrating the genuine nature of the appellee's signature on the

10

agreement). To hold otherwise would contravene the Texas Legislature's policy in favor enforcing electronic transactions. *Aerotek*, 624 S.W.3d at 209–10; *see also* TEX. BUS. & COM. CODE ANN. § 322.006 (providing that the Act must be "construed and applied: (1) to facilitate electronic transactions consistent with other applicable law; (2) to be consistent with reasonable practices concerning electronic transactions and with the continued expansion of those practices . . .").

With these principles in mind, we turn to the question of whether the Solar Defendants conclusively established the genuine nature of Meraz's signature and initials on the electronic contracts in accordance with the Act.

## C. We may infer that Meraz agreed to conduct business by electronic means

As a preliminary matter, we first consider Meraz's argument that the Act does not apply to his contracts with the Solar Defendants. As set forth above, the Act only applies to transactions between parties who have agreed to conduct business by electronic means. *See* TEX. BUS. & COM. CODE ANN. § 322.005. And Meraz contends that nothing in the record suggests he agreed to conduct business by electronic means and that the Act therefore does not apply in determining whether he signed the Solar Defendants' contracts. We disagree.

The Act provides that the question of whether a party agreed to "conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." *Id.* § 322.005. Significantly, the Act does not require proof that the parties entered into an independent agreement to conduct business electronically or require express proof of such an agreement; instead, a party's consent to enter into an electronic transaction may be inferred from a variety of factors surrounding the transaction itself. *See Parks v. Seybold*, No. 05-13-00694-CV, 2015 WL 4481768, at *5 (Tex. App.—Dallas July 23, 2015, no pet.) (mem. op.) (upholding trial court's finding that the parties' discussions, interactions, and behavior demonstrated that they agreed to transact business electronically) (citing TEX. BUS. & COM. CODE

11

ANN. § 322.005(d)); *Cunningham v. Zurich Am. Ins. Co.*, 352 S.W.3d 519, 529 (Tex. App.—Fort Worth 2011, pet. denied) ("As with determining whether a signature was the act of a person, in determining whether the parties agreed to conduct a transaction by electronic means, we consider the context and surrounding circumstances, including the parties' conduct."); *see also* TEX. BUS. & COM. CODE ANN. § 322.002(1) (providing that an agreement can be found not only in the language of a contract itself, but may be "inferred from other circumstances . . . "). Moreover, the Act provides that a person's consent to enter into an electronic contract can be inferred not only from the circumstances in existence at the time of a contract's creation or execution but from a party's subsequent adoption of the contract. TEX. BUS. & COM. CODE ANN. § 322.009(b).

Here, although Meraz repeatedly stated in his affidavit that he did not sign the electronic contracts at issue, he never denied that he agreed to conduct business with the Solar Defendants electronically. In addition, although he averred in his affidavit that he repeatedly sought to review the Solcius contract prior to installation, he never stated that he sought to review paper copies of the contract or that he otherwise asked to conduct the transaction using paper contracts. More importantly, Meraz acknowledged in his affidavit that he received copies of the signed electronic versions of the parties' contracts by email, and there is nothing in the record to suggest that he notified either Solcius or Goodleap that he objected to conducting business electronically at that time. Thus, from Meraz's actions, we can infer that he agreed to conduct business by electronic means.

## D. The Solar Defendants' evidence establishing the efficacy of their security measures

This brings us to the dispositive issue of whether the Solar Defendants provided sufficient evidence to support a finding that the electronic transaction security procedures were sufficient to conclusively establish the genuine nature of Meraz's signature. We conclude that they did.

In *Aerotek*, the Texas Supreme Court explained that

12

security procedures may include requiring personal identifying information—such as a social security number or an address—to register for an account; assigning a unique identifier to a user and then tying that identifier to the user's actions; maintaining a single, secure system for tracking user activities that prevents unauthorized access to electronic records; business rules that require users to complete all steps in a program before moving on or completing it; and timestamps showing when users completed certain actions.

*Aerotek,* 624 S.W.3d at 205–06. The court noted, however, that these examples were merely "illustrative and not exclusive" under the Act. *Id*. at 206. Here, both Solcius and Goodleap provided evidence of the security procedures they regularly used when entering into electronic agreements with their customers as well as the specific procedures they used to obtain Meraz's signature on the contracts at issue, which contained many of the same security features listed in the *Aerotek* opinion. We review each agreement separately.

### 1. The Loan Agreement

In his sworn declaration, Goodleap's CFO Matt Dawson explained that Goodleap has a standard practice of sending its customers who have previously applied for and received approval for a loan an email with key information pertaining to the terms of the loan. Goodleap sends this correspondence to the email address the customers previously provided. He explained that if the customer is satisfied with the terms, the customer may then "click a link within the subject email to proceed to the signing of the Loan Agreement." Thereafter, Goodleap will transmit the Loan Agreement to the customer's email address to review and sign electronically using DocuSign's technology platform. According to Dawson, "[d]ocuments transmitted via DocuSign can only be opened by an individual with access to the customer provided e-mail address." Dawson further explained that once the Loan Agreement is signed, a copy is transmitted to the customer-provided email address, and once again, can only be accessed there by the customer. And in the final step in the process, he explained that Goodleap receives a DocuSign certificate for the transaction,

13

which "records the date and time of the execution of the Loan Agreement document by the customer, among other key information."

Dawson averred that after Meraz applied for and received approval for his loan to install his solar panels, Goodleap followed its standard practice by sending Meraz the Loan Agreement to his previously provided email address through DocuSign. In addition to providing copies of the electronic agreement with Meraz's signature on it, Dawson provided a certificate of completion from DocuSign dated March 13, 2019, containing record tracking and time stamps indicating that the Loan Agreement was sent to Meraz's email address at 11:22:22 a.m. that same day; that Meraz viewed the agreement at 11:29:21 a.m.; and that he signed the agreement at 11:35:08 a.m., using a previously adopted electronic signature style. The certificate provided an IP address that corresponded to the mobile phone that had been used to sign the agreement. And finally, the certificate contained an envelope summary of events indicating that the signed document was encrypted and that security checks were performed with respect to the delivery, signing, and completion of the document.

## 2. The Installation Agreement

In his affidavit, Solcius's employee, Michael Molen, provided a similar explanation of how Solcius conducts its electronic transactions. In particular, he explained that when a customer expresses interest in purchasing a home solar system, Solcius "transmits its Installation Agreement to the customer provided e-mail address via DocuSign for their review and signature." And Molen explained that documents "transmitted via DocuSign can only be executed by an individual with access to the customer provided e-mail address." He further explained that after a customer executes the Installation Agreement, DocuSign transmits the executed copies of the agreement to the customer at his previously provided email address. According to Molen, Solcius followed this standard procedure in obtaining Meraz's signature and initials on the Installation Agreement by

14

sending the agreement to Meraz's previously provided email address (the same one that Meraz provided to Goodleap). He further noted that Meraz had confirmed his email address on several occasions, including during a recorded welcome call that Solcius conducted after Meraz orally agreed to the installation.

Moreover, in support of its Motion for Reconsideration, Solcius provided a certificate of completion generated by DocuSign with respect to the Installation Agreement. The document contains record tracking and time stamps showing that a Solcius representative received and viewed the contract on March 13, 2019, at 12:24:13 p.m. and signed it at 12:25:53 p.m. that same day. According to the certificate, the document was then sent to Meraz for signature at his previously provided email address that same day at 12:26:00 p.m., was viewed by Meraz at 12:26:52, and was signed by him at 12:28:41 p.m., using a previously adopted signature style. The certificate also contained the IP address of the mobile phone that was used to sign the agreement, which was the same IP address listed in the Goodleap certificate of completion. The DocuSign certificate indicates that the signed contract was then sent to a Solcius representative that same day at 12:28:49 p.m. And finally, the certificate contained an envelope summary of events indicating that the document was encrypted and that security checks were performed with respect to the delivery, signing, and completion of the document.

### 3. Meraz failed to rebut the efficacy of the security measures

In the trial court, Meraz made no attempt to challenge the efficacy of the above-described security measures used by Solcius and Goodleap, and, in particular, he made no attempt to demonstrate that the DocuSign certificates of completion were fraudulent or that they did not accurately or reliably reflect the true nature of the parties' transactions. Moreover, Meraz did not contend that the email address listed on the certificates (the same email to which the contracts were sent) was not his email address, and he further failed to present any evidence to suggest that the

15

listed IP address for the mobile phone used to complete the electronic transactions was not associated with his device.[8] And, as set forth above, Meraz admitted that he subsequently received copies of the electronically signed contracts via email on an undisclosed date, yet he provided no evidence to suggest that he objected to the validity of either contract upon receipt, and it appears that he instead only claimed that he did not sign the contracts after the Solar Defendants sought to enforce the arbitration provisions.[9]

Further, rather than challenge the reliability of the electronic contracts, Meraz simply alleged that he did not sign the electronic contracts or enter his initials under the arbitration provision in the contracts. An affidavit of this nature is insufficient to rebut otherwise conclusive proof that an electronic signature was obtained through reliable procedures and is tantamount to no evidence at all under these circumstances. *See Aerotek*, 624 S.W.3d at 210; *see also Knox Waste Serv., LLC*, 2021 WL 4470876, at \*9. We therefore conclude that Meraz's affidavit did not create a fact issue regarding whether the signature on the Solar Defendants' contracts was genuine, and in turn, did not raise a fact question regarding the validity or enforceability of the arbitration provisions in the contracts.

### 4. The typographical error in the translated version of the Solcius agreement

In the trial court, Meraz also sought to cast doubt on the Solcius arbitration agreement by pointing out that the first English-translated version of the Installation Agreement Solcius provided

---

[8] The Act provides that unless otherwise agreed between the sender and the recipient, an electronic record is sent when it "is addressed properly or otherwise directed properly to an information processing system that the recipient has designated or uses for the purpose of receiving electronic records[.]" TEX. BUS. & COM. CODE ANN. § 322.015(a)(1). It similarly provides that an electronic record is received when "it enters an information processing system that the recipient has designated or uses for the purpose of receiving electronic records[.]" *Id.* § 322.015(b)(1).

[9] We note that the Act gives an individual the opportunity to correct any errors in an electronic document, but provides that the individual must promptly notify the other party that it did not intend to be bound by the agreement upon discovering error and must do so before it has accepted the benefits of the agreement. TEX. BUS. & COM. CODE ANN. § 322.010(c). Here, although Meraz admits he received a copy of the electronic records from both Solcius and Goodleap, there is nothing in the record to suggest that he promptly sought to notify either entity that he did not intend to be bound by the agreements.

to the trial court contained two discrepancies. In this first version, which was translated in February 2022, the translator put the following information on the signature line on the final page: "Salvador Meraz /s/ Hector Garcia" and the initials HG on the line below the arbitration provision. Meraz contends that this discrepancy created a fact question regarding whether he signed the agreement. We disagree for at least two reasons.

First, the original version of the agreements in Spanish did not contain any similar use of the name Hector Garcia or the initials HG. Instead, the version in Spanish is electronically signed "Salvador Meraz" in the style that Meraz adopted, and the arbitration provision contains the initials "SM," making it clear that this was nothing more than the translator's typographical error. Second, after the discrepancy was discovered, Solcius alerted the trial court that "[t]he previously provided translation[] . . . included certain typographical errors (namely, references to HG and Hector Garcia, as well as an incorrect start date for the contract), that did not appear in the original documents." Solcius further provided the trial court with a corrected version of the agreement in English for the court's review, along with a translation certificate stating that the translation was made in May 2022. Meraz made no attempt to challenge the accuracy of the second translation and did not provide his own translated version of the agreement. Accordingly, we find that Meraz's challenge to the reliability of the Installation Agreement on this basis is without merit.

We conclude that Solcius and Goodleap both presented sufficient unrebutted evidence that conclusively established the genuine nature of Meraz's signatures on the contracts. And because Meraz has brought no other challenges to the validity or enforceability of the arbitration provisions contained in those contracts, we conclude that the trial court erred in denying the Solar Defendants' motion to compel arbitration.

**E. The trial court should stay rather than dismiss the lawsuit pending arbitration**

Although we agree with the Solar Defendants that the trial court was required to compel arbitration, we disagree that the court was required to dismiss Meraz's lawsuit upon ordering the parties to arbitration. The Texas Civil Practices and Remedies Code provides that a court shall stay a proceeding that involves an issue subject to arbitration if an order for arbitration or an application for that order is made under this subchapter. TEX. CIV. PRAC. & REM. CODE ANN. § 171.025(a); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 171.021(c) ("An order compelling arbitration must include a stay of any proceeding subject to Section 171.025."); *see also In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 549 (Tex. 2002) (orig. proceeding) (per curiam) (where valid arbitration agreement exists for which there is no valid defense, a "trial court has no discretion— it must compel arbitration and stay its own proceedings"). And as the Texas Supreme Court has recognized, a "stay is generally the only appropriate order for a state court with jurisdiction of all issues." *In re Gulf Expl., LLC*, 289 S.W.3d 836, 841 (Tex. 2009) (orig. proceeding). The Texas Arbitration Act provides that "[a]n order compelling arbitration *must* include a stay" of the underlying litigation. *Id*. (citing TEX. CIV. PRAC. & REM. CODE § 171.021(c) (emphasis added). This is because "[d]uring arbitration, a court order may be needed to replace an arbitrator, compel attendance of witnesses, or direct arbitrators to proceed promptly; [and] after arbitration, a court order is needed to confirm, modify, or vacate the arbitration award." *Id*. (footnotes omitted). Consequently, dismissal is typically inappropriate because the trial court cannot dispose of all claims and all parties until arbitration is completed. *Id.* Here, we find no reason to deviate from the general practice of issuing a stay of Meraz's lawsuit pending arbitration.

18

## V. Conclusion

We reverse the trial court's order denying the motion to compel arbitration and remand to the trial court with directions to order the parties to arbitration and to stay Meraz's lawsuit pending the outcome of the arbitration.

LISA J. SOTO, Justice

February 27, 2023

Before Rodriguez, C.J., Soto, J., Marion, C.J. (Ret.)
Marion, C.J. (Ret.) (sitting by assignment)